# JUDGE KOELTL

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW **08 CV 0050⁹**

In the Matter of the Arbitration Between
Mitsubishi Heavy Industries, Ltd. and
Mitsubishi Power Systems Americas, Inc.,

No. _____

                           Petitioners,

        And

Stone & Webster, Inc.

                           Respondent.

---

**MEMORANDUM IN SUPPORT OF PETITIONERS'
MOTION TO VACATE AN ARBITRAL AWARD PURSUANT TO 9 U.S.C. §10**

---

SILLS CUMMIS & GROSS, P.C.
Philip R. White, Esq.
Loryn P. Riggiola, Esq.
One Rockefeller Plaza
New York, New York  10020
Telephone: (212) 643-7000
Fax: (212) 643-6500
pwhite@sillscummis.com
lriggiola@sillscummis.com

## TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT .................................................................................. 1

STATEMENT OF FACTS ........................................................................................ 5

    A.    WOLF HOLLOW PROJECT ............................................................... 5

    B.    THE PARTIES ................................................................................... 6

    C.    S&W CONTRACTS WITH AES TO TAKE OVER AS EPC
        CONTRACTOR ................................................................................ 8

    D.    DELAY AND ASSESSMENT OF LIQUIDATED DAMAGES ........................ 9

    E.    SUPPLY CONTRACT PROVISIONS BETWEEN S&W AND
        MITSUBISHI ................................................................................... 9

    F.    THE ARBITRATION HEARING AND MAJORITY ........................................ 13

ARGUMENT

POINT ONE .......................................................................................................... 14

    THE PARTIAL FINAL AWARD SHOULD BE VACATED BECAUSE THE
    MAJORITY MANIFESTLY DISREGARDED THE LAW AND THE TERMS
    OF THE CONTRACT. ....................................................................................... 14

    A.    THE AWARD SHOULD BE VACATED BECAUSE THE MAJORITY
        MANIFESTLY DISREGARDED THE LAW AND CONTRACT
        PROVISIONS REGARDING SCHEDULING AND DELAY
        DAMAGES. ................................................................................... 16

    B.    THE AWARD SHOULD BE VACATED BECAUSE THE MAJORITY
        MANIFESTLY DISREGARDED THE CONTRACTUAL PROVISION
        THAT LDS COULD NOT BE AWARDED FOR SERVICES. ........................ 21

    C.    THE AWARD SHOULD BE VACATED BECAUSE THE MAJORITY
        MANIFESTLY DISREGARDED THAT LDS COULD NOT BE
        AWARDED FOR EQUIPMENT DEFECTS POST- PROVISIONAL
        ACCEPTANCE BECAUSE SUCH DEFECTS BECAME WARRANTY
        ISSUES. ........................................................................................ 23

    CONCLUSION ................................................................................................ 25

## TABLE OF AUTHORITIES

CASES

*AT&T Techns. v. Commc'ns Workers of Am.*, 475 U.S. 643 (1986)...........................................14

*China Minmetals Materials Import & Export Co. v. Chi Mei Corp.*, 334 F.3d 274 (3d Cir. 2003) ...............................................................................................................................14-15

*DiRussa v. Dean Witter Reynolds, Inc.*, 121 F.3d 818 (2d Cir. 1997)...........................................16

*Dluhos v. Strasberg*, 321 F.3d 365 (3d Cir. 2003)...................................................................14

*Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383 (2d Cir. 2003)........ 15-16

*Fahnestock & Co. v. Waltman*, 935 F.2d 512 (2d Cir. 1991) ................................................. 15-16

*Goldman v. Architectural Iron Co.*, 306 F.3d 1214 (2d Cir. 2002) ........................................ 15-16

*Harrison v. Nissan Motor Corp.*, 111 F.3d 343 (3d Cir. 1997) ....................................................14

*In re Marine Pollution Serv., Inc.*, 857 F.2d 91 (2d Cir. 1988) ....................................................16

*Leed Architectural Prods., Inc. v. United Steelworkers of Am., Local 6674*, 916 F.2d 63 (2d Cir. 1990)...................................................................................................... 15-16

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930 (2d Cir. 1986)............ 15-16

*NBC v. Bear Stearns & Co.*, 165 F.3d 184 (2d Cir. 1999) ..........................................................14

*Sole Resort S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100 (2d Cir. 2006)..................14

*United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564 (1960) (Brennan, J., concurring)......................................................................................................................14

*Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15 (2d Cir. 1997)..... 15-16


STATUTES, RULES & REGULATIONS

9 U.S.C. §10.......................................................................................................1, 15, 21, 25

*9 U.S.C. §§ 10, 11* .............................................................................................................15

*Rules, R-3, Article 19.3* ...................................................................................................3, 18-19

**OTHER AUTHORITIES**

Contracts, Article 20.3(viii) ...........................................................................................20

Contracts, Articles 2.2 and 2.10...........................................................................................4

Contracts, Articles 9.1.1, 9.9.1, 9.11.5.................................................................................4

## PRELIMINARY STATEMENT

Petitioners Mitsubishi Heavy Industries, Ltd. ("MHI") and Mitsubishi Power Systems Americas, Inc. ("MPSA") (collectively, "Mitsubishi") submit this Memorandum in support of their Motion to Vacate an Arbitral Award Pursuant to 9 U.S.C. §10 in favor of Respondent Stone & Webster, Inc. ("S&W"). S&W was an engineering, procurement and construction ("EPC") contractor on an energy project located in Granbury, Texas, referred to as the Wolf Hollow Project. Mitsubishi was an equipment supplier on the same project.

The arbitration award issued by the majority should be vacated. After two years of deliberations, the arbitrators could not agree and the majority issued an award in favor of S&W and against Mitsubishi of $14,504,519.11 for 108.5 days of delay.[1] To reach its decision, the two majority arbitrators manifestly disregarded the law and the terms of the agreement. They paid lip service to the contract provisions that limited their ability to assess liquidated damages ("LDs") and then embarked upon a trail of assumptions to arrive at the destination they predetermined --- a $14.5 million award of LDs in favor of S&W.

The reason is, at the same time as this arbitration was conducted, S&W was defending delay claims asserted by the owner of the project against S&W. All parties to this project agreed to perform in accordance with a critical path method ("CPM") schedule. Rather than insist that the claimant produce a CPM and that Mitsubishi respond, the majority employed a substandard "slide-rule" approach reviewing weekly and monthly reports. In fact, many of the reports relied upon by the majority were prepared by S&W and Mitsubishi had no opportunity to cross-

---

[1] A copy of the majority opinion is attached as Exhibit A to the Affirmation of Philip R. White in Support of Motion to Vacate an Arbitral Award Pursuant to 9 U.S.C. §10, executed on January 18, 2008 ("*White Aff.*"). On or about November 16, 2007, Mitsubishi received the majority opinion dated October 26, 2007 and the dissenting opinion by Arbitrator Edward Vena dated November 14, 2007 (the "Dissent"). *(White Aff., Exs. A and B.)*

examine or verify the contents of the documents because S&W did not produce its project control manager as a witness.

Amazingly, the majority issued this award without ever examining the CPM baseline schedule referenced in the contracts, and without ever performing any comparison of the baseline schedule to the as-built schedule. S&W failed to submit any CPM analysis and even when invited to do so by the tribunal, it refused. The arbitrators invited S&W to produce an expert report or even its project control manager that handled the scheduling, but S&W refused. *(White Aff., Ex. A at 86, ¶152.)* The majority also took note of, discussed and disregarded three unambiguous contract provisions that limited Mitsubishi's exposure to LDs to only when the delays were caused by shortfalls or defects in the equipment it supplied and which barred LDs for delays caused by the service portion of its work scope and for time periods after provisional acceptance of the power station.

After two years of deliberations and an opinion that exceeded 600 pages, which is short on analysis and voluminous on replicating the arguments of the parties, the majority rendered a Partial Final Award ("PFA") that manifestly disregarded the agreements, the governing legal principles, and the expectations of the parties. Set forth below is a brief description of some of the deficiencies that warrant that the PFA be vacated:

- Under Article 2.10 of the Supply Contracts,[2] the parties agreed that the baseline CPM schedule would be the basis from which performance and any purported delay would be measured. The majority never considered the CPM baseline schedule let alone measure Mitsubishi's performance against it.

_____

[2] The two contracts that were assigned to S&W were (1) the Contract Between AES Wolf Hollow, L.P. ("Purchaser") and Mitsubishi Heavy Industries, Ltd. ("Supplier") for the Supply of 2 M501G Combustion Turbine Generators and 1 Steam Turbine Generator ("Turbine Contract," attached as Exhibit D to the *White Aff.*), and (2) the Contract between AES Wolf Hollow, L.P. and Mitsubishi Heavy Industries America, Inc. ("Supplier") for the Supply of 2 Heat Recovery Steam Generators ("HRSGs Contract," attached as Exhibit E to the *White Aff.*), which collectively are referred to as the "Supply Contracts." *(White Aff., Ex. A, PFA at 8.)*

- The International Centre for Dispute Resolution ("ICDR") Procedures expressly provide that at any time the tribunal can order the parties to produce documents or evidence it deems appropriate. *(ICDR Procedures, International Arbitration Rules, R-3, Article 19.3.)* Under Article 19.3 of the ICDR Rules, the arbitrators could have and should have requested the necessary information from the parties and the majority could have and should have required the parties to submit a CPM analysis so the arbitrators could properly analyze delay under the terms of the agreements. At the very least, the majority should have announced that it was going to perform its own scheduling analysis that deviated from the terms of the contract.

- Not a single witness testified on behalf of S&W that presented the schedules provided for in the Supply Contracts and analyzed the alleged delay by comparing the baseline schedule and actual performance of Mitsubishi and other contractors.

- The Supply Contracts provide for the use of a network scheduling software package, Primavera, which measures the delay, traces and identifies which activities are critical, and calculates any delay that occurs simultaneously. The process is mathematical and objective.

- The majority here employed a subjective methodology the parties never agreed to and Mitsubishi never had notice of. They reviewed reports (the weekly reports were only internal to S&W) and performed what they described as the legal equivalent of a "slide rule" approach not based upon scheduling methodology but by counting days and making assumptions. Mitsubishi has been severely prejudiced because it was denied the opportunity to cross-examine or challenge the analysis employed by the majority and because they employed a standard and measured Mitsubishi's performance in a manner that Mitsubishi never agreed to.

- Even S&W has made an application to the tribunal because they claim that the majority did not properly calculate the delay. This is the very reason why the parties insisted that the scheduling technology available be used to measure and schedule performance on the Project and associated delay or acceleration. *(See White Aff., Exs. D and E, Supply Contracts, Article 2.10.)*

- On March 7, 2002, S&W took over as the general contractor because its predecessor filed bankruptcy. At that time, the Project was already in delay mode. S&W itself assessed the project as 76 days late. *(See White Aff., Ex. H.)* Mitsubishi received no credit for this delay. The PFA does not even address this fact.

- Mitsubishi also received no credit for the delays caused by others, including a building fire S&W characterized as causing 60 days delay; boiler feedwater pumps which caused a 14 days delay, condenser tubes that leaked causing a 30.5 day delay. *(White Aff., Ex. F, at 2-3, 110, 113-114, 117-118.)*

3

- The majority also failed to recognize the contractual provisions of the Supply Contracts, Articles 9.1.1, 9.9.1, 9.11.5, that distinguish between equipment and services. *(White Aff., Exs. D and E.)* The sole contractual remedy for services that cause delay is that Mitsubishi must use its best efforts (including overtime) in order to mitigate delay.

- The majority also failed to abide by the contractual terms, Articles 9.1.1 and 9.9.1, which only permit LDs for the period of time before Provisional Acceptance ("PA"). *(White Aff., Exs. D and E.)* Instead, the majority ignored the restriction and awarded an additional 11 days at $185,000 per day for LDs related to the alleged non-conformity of ammonia fans after PA.

- As recognized by the dissent, "the members of the majority not only ... exceeded the powers and authority conferred upon this Tribunal by the IDRP, but have also unfairly deprived Mitsubishi, in both substantive and procedural terms, of its rights under the IDRP." *(White Aff., Ex. B, Dissent at 3.)*

By virtue of this appeal, Mitsubishi seeks to vacate the PFA based upon the Tribunal's manifest disregard of the law and the terms of the Supply Contracts. First, the Supply Contracts, Articles 2.2 and 2.10, require the use of the CPM schedule in the performance of the Project and that the baseline CPM be updated monthly with delays and accelerations. The Tribunal did not employ a CPM analysis and did not consider the baseline CPM schedule. Second, Article 9.9.1 of the Supply Contracts provides that, for liquidated damages to be awarded, the delay must be before PA and "must be attributable to short-falls in the performance of the Equipment."

Although the Tribunal recited the contractual provisions of Article 9.9.1, it failed to apply any of the principles or limitations to the case at hand. Rather the majority awarded LDs for post-PA delays and awarded LDs for performance by Mitsubishi that was service related, and not equipment performance or defect related. Because the Tribunal did not engage in proper CPM analysis, it confused the theory of concurrent delay and failed to acknowledge that there may be instances where, as here, more than one item can cause delay on the critical path, and in such cases an award of LDs is not appropriate.

4

.

Mitsubishi respectfully submits that the Tribunal exceeded its authority by: 1) failing to measure any purported delay against the baseline schedule provided for in the Supply Contracts; 2) engaging in its substandard "slide rule" approach as compared to the CPM analysis provided for in the Supply Contracts; 3) by awarding LDs for service related performance; and 4) by awarding LDs after PA. As a result, Mitsubishi respectfully requests that the PFA be vacated and the matter remanded for reconsideration.

## STATEMENT OF FACTS

### A.    WOLF HOLLOW PROJECT

The Wolf Hollow project is a gas-fired, combined cycle electric power plant located in Hood County, Texas (the "Wolf Hollow Project"), which is near Granbury, Texas. The Wolf Hollow Project consists of Mitsubishi supplied equipment including two combustion turbine generators ("CTGs"), two heat recovery steam generators or boilers ("HRSGs") and a steam turbine generator ("STG"). This combined-cycle facility utilizes environmentally friendly technology to raise the electrical output of a gas operated power station by recovering the thermal energy in the gas turbine exhaust. It is fueled by natural gas, and the exhaust heat from the CTGs is contained and directed into the HRSGs, which are large boilers where the heat is then used to produce steam and the steam is fed into the steam turbine. The CTGs (gas turbines) and HRSGs (boilers) are coupled with their respective generators which then produce electrical output for the ultimate consumers. *(White Aff., Ex. F, Respondents' Statement of Case, dated 1 March 2005 ("SOC") at 10;*[3] *White Aff., Ex. G, Plaintiff's Second Amended Petition ¶ 3.)* Wolf

---

[3] For purposes of this Memorandum, Mitsubishi has attached to the *White Aff.* selected excerpts from Respondents' Statement of the Case, submitted in the arbitration on March 1, 2005, to support certain factual assertions made herein. For the purpose of efficiency, we have made a partial production containing the excerpts referenced, but will provide a complete copy of the Statement of the Case if requested by the Court or a party.

Hollow was designed to generate 715 megawatts of power for over 50,000 households in Texas. *(White Aff., Ex. F, SOC at 10.)*

**B.    THE PARTIES**

The Wolf Hollow Project came about when, on October 1, 2000, the owners of the project which are two affiliates of AES Corporation, AES Wolf Hollow, L.P. (owner of tangible assets) and AES Frontier L.P. (owner of intangible assets) (collectively, "AES"), entered into a series of contracts with National Energy Production Corporation ("NEPCO") for the engineering, procurement and construction of the Wolf Hollow Project (the "NEPCO Contracts"). *(White Aff., Ex. C; see also White Aff., Ex. F, SOC at 13.)* Thereafter, on January 31, 2001, AES entered into two supply contracts with Mitsubishi (collectively the "Supply Contracts"). *(White Aff., Exs. D and E.)* AES assigned the Supply Contracts to NEPCO in September 2001. *(White Aff., Ex. F, SOC at 13.)*

NEPCO was a wholly owned subsidiary of Enron Corp. ("Enron"), and Enron had provided a parent guarantee to AES to secure NEPCO's performance. *(Id.)* After Enron's bankruptcy in December 2001, AES defaulted NEPCO, and in January 2002, NEPCO reassigned the Supply Contracts back to AES. *(Id. at 13-14.)*

After NEPCO's default but before the termination of NEPCO's contracts, AES began negotiating with Respondent S&W to take over as completion EPC contractor. *(Id. at 14.)* In February 2002, S&W entered into a memorandum of understanding where S&W took over as EPC contractor with contractual terms essentially identical to those between AES and NEPCO. *(Id.)* In connection with its takeover of the Project, however, S&W only negotiated a 14 day extension to the construction schedule (an extension of the Guaranteed Provisional Acceptance Date from October 1, 2002 to October 15, 2002). All agree that the 14 day extension was insufficient to complete the Project. *(Id. at 16-17.)*

6

The Supply Contracts required that Mitsubishi and the EPC Contractor (S&W) perform according to the baseline schedule referred to as the "Project Schedule," annexed to the Supply Contracts. The Supply Contracts also required that Mitsubishi provide an electronic schedule in a manner consistent with the Project Schedule, which would serve as Mitsubishi's baseline CPM schedule, which was annexed to the Supply Contracts. In addition the Supply Contracts provided that delay and accelerations must be referenced and updated in the schedule on a monthly basis. *(White Aff., Exs. D and E, Supply Contracts, Articles 1.1 ("Project Schedule") and 2.10.)*

S&W is the successor to a company that filed bankruptcy in 2000, and which was purchased by the Shaw Group, Inc. ("Shaw"). *(White Aff., Ex. F, SOC at 10.)* S&W replaced NEPCO as the EPC contractor at Wolf Hollow in March 2002 following the bankruptcy of NEPCO's parent company, Enron. *(Id. at 11.)*

MHI is a Japanese company headquartered in Japan, and it provides machinery and services for the energy industry. The products sold by MHI include gas turbines and steam turbines. *(Id.)* MHI supplied two gas turbines, generators and a steam turbine for the Wolf Hollow project. *(See generally White Aff., Ex. D.)* In addition to supplying the equipment, MHI was obligated to provide an agreed number of hours for consultation and advisory services referred to as Technical Field Advisory ("TFA") services. *(Id.; see also White Aff., Ex. F, SOC at 11.)*

MPSA is a subsidiary of MHI with its principal offices in Lake Mary, Florida.[4] MPSA subcontracted the supply of two HRSGs used to generate the steam that drives the steam turbine

---

[4] MPSA's predecessor in interest on the Wolf Hollow Project was Mitsubishi Heavy Industries America, Inc. ("MHIA"), also a MHI affiliate. MHIA assigned its rights and obligations on the Wolf Hollow Project to MPSA in July 2001. *(White Aff., Ex. F, SOC at 12.)*

and other auxiliary equipment. MPSA's scope for the Project was limited to the supply of the identified equipment and to providing an agreed amount of TFA services to the EPC contractor. *(White Aff., Ex. F, SOC at 12.)*

The EPC contractor (S&W), not Mitsubishi, had responsibility for the installation, start-up, testing and initial operation of the equipment supplied by MPSA. *(Id. at 12 & n.12.)*

## C.    S&W CONTRACTS WITH AES TO TAKE OVER AS EPC CONTRACTOR

On March 7, 2002, S&W entered into EPC agreements with AES to complete Wolf Hollow for a fixed price of approximately $72 million. Under the EPC agreements, S&W became responsible for completing the Wolf Hollow Project, and also became responsible for all of the work and services previously performed by NEPCO. In fact, S&W received approximately an additional $28 million to assume responsibility for the work performed by its predecessor. S&W was paid about $100 million for the Wolf Hollow Project. *(Id. at 16.)*

S&W negotiated only a 14 day extension to the construction schedule, moving the Guaranteed Provisional Acceptance Date ("GPAD") from October 1, 2002 to October 15, 2002. S&W's own site manager, Mike Obert testified that "four or five weeks" would have been a more realistic schedule extension. *(Id.)* Mitsubishi was not a participant in the negotiations and was not consulted regarding the extension negotiated by S&W with AES.

In a Second Amended Petition filed in Texas by S&W against AES, S&W alleged that it did very little due diligence regarding the Wolf Hollow Project. *(White Aff., Ex. G, Plaintiff's Second Amended Petition, ¶ 14.)* S&W had a few representatives visit the site to view the work. S&W was not permitted to: 1) contact the prior EPC contractor, NEPCO; or 2) make any detailed surveys of the work. *(Id.)* Instead, S&W just relied on the representation of AES that the construction was 64% complete. S&W itself attributed 76 days of delay in achieving PA to

8

AES's overstatement of the engineering progress during negotiations. *(White Aff., Ex. H, Letter from Ronnie Volentine to Mr. Fang Qing, AES Wolf Hollow L.P., dated January 9, 2003; see also White Aff., Ex. F, SOC at 14-15, 17-18.)*

## D.    DELAY AND ASSESSMENT OF LIQUIDATED DAMAGES AGAINST S&W

S&W failed to achieve PA on October 15, 2002, and achieved "conditional" PA on August 8, 2003. *(White Aff., Ex. F, SOC at 1.)* S&W sought to pass nearly all of the liquidated damages delay (282 days) on to Mitsubishi. *(Id. at 1, 25.)* Because S&W did not achieve PA as it promised to AES, AES began to assess LDs in the form of "price rebates." *(Id. at 22.)* The total rebates assessed by AES against S&W were about $39 million *(id. at 22-23)*, and S&W then alleged that Mitsubishi was responsible for $38 million *(id. at 23, 24-25)*.

On November 5, 2002, S&W instituted an action in Texas against AES claiming that the delays were not caused by S&W or Mitsubishi but by, among other things, the fraud of AES and others. *(Id. at 23.)* S&W did not claim that Mitsubishi was even partially responsible for the Project delays. *(Id. at 24.)*

## E.    SUPPLY CONTRACT PROVISIONS BETWEEN S&W AND MITSUBISHI

The Supply Contracts expressly limit the authority of the arbitrators to award damages. Pursuant to Article 20.3(viii):

> The arbitrators are not empowered to award damages in excess of compensatory damages. In arriving at their decision, the arbitrators shall be guided and bound by the terms and conditions of the Contract.

*(White Aff., Exs. D and E.)*

Pursuant to the Turbine Contract, in order to assess liquidated damages against Mitsubishi, S&W must demonstrate that: (1) liquidated damages under the EPC Contracts

(rebates) were assessed by AES against S&W and paid by S&W; and (2) such liquidated

damages for delay were attributable to Mitsubishi, either because of non-performance of

Mitsubishi equipment or defects in Mitsubishi equipment which caused PA to occur beyond

GPAD. *(White Aff., Ex. D, Turbine Contract, Articles 9.1.1, 9.1.2, 9.9.1.)*

The specific provisions of the Supply Contracts that address liquidated damages are set

forth in more detail below.

Article 9.1.1, expressly provides in relevant part:

In the event that a) Supplier [Mitsubishi] fails to meet the Scheduled Delivery
Dates for Key Document Packages or the Key Equipment Packages…or….fails to
meet Scheduled Delivery Dates…or b) the Equipment … caused Provisional
Acceptance to occur beyond the Guaranteed Provisional Acceptance Date as
provided for in Article 9.4 … it is agreed that the Purchaser [S&W] may be
damaged in an amount … which will be difficult to ascertain….Therefore,
Supplier [Mitsubishi] shall pay the amounts stated in this Article 9.0 as liquidated
damage….

*(Id., Article 9.1.1.)*

Article 9.1.2, often called the "no harm no foul provision" provides as follows:

Except for liquidated damages payable under Article 9.2 and under Article 9.3, all
other liquidated damages payable by Supplier shall become due only to the extent
such liquidated damages are paid by the EPC Contractor [S&W] to the Owner
[AES] under the EPC Contract.

*(Id., Article 9.1.2.)* As a result of this provision, Mitsubishi cannot be liable for any LDs

unless those LDs are first paid by S&W to AES for the alleged delay caused by

Mitsubishi. There will have to be a second hearing in the pending arbitration to

determine whether the settlement agreed to between S&W and AES provided for

payment by S&W to AES for delays caused by Mitsubishi.

Article 9.9.1, part of Article 9.9 which is entitled "Delay in Achievement of Provisional

Acceptance" sets forth as follows:

10

per scheduling order filed 11/7/07

If the requirements for Provisiona[...] been achieved by Guaranteed Provisional Acceptance Date, Su[...] **nt the delay is attributable to short-falls in the performance o[...]** ether with equipment furnished under the HRSG Contract (comb[...] **ch equipment which prevent such equipment from being sta[...]hin the required time,** supplier shall pay to Purchaser, monthly …(a) … $120,000 … per Day … in any month except June, July, August and September and (b) … $185,000 … per Day.

*(Id., Article 9.9.1) (emphasis added).*

Finally, in Article 9.11.5, the parties agreed that if Mitsubishi caused delays that do not provide for LDs, then S&W's sole remedy and Mitsubishi's sole liability for the delay shall be for Mitsubishi to use its best efforts to overcome or mitigate the delay. Article 9.11.5 provides as follows:

> With respect to delays in the performance of Work by Supplier which do not attract liquidated damages under this contract, the Purchaser's **sole remedy and the Supplier's exclusive liability** shall be for Supplier to use its best efforts, including but not limited to, working overtime and multiple shifts, to overcome or mitigate the delay. In the event Supplier fails to so utilize its best efforts, then Purchaser may upon Notice to Supplier, procure the delayed Work from others, in which event the reasonable costs of such Work shall be for the Supplier's account.

*(Id., Article 9.11.5.) (emphasis added).*

In Article 9.9.1, the Turbine Contract provides that if PA is not achieved by GPAD, then Mitsubishi, "to the extent the delay is attributable to short-falls in performance of the Equipment," shall pay LDs. *(Id., Article 9.9.1.)*

The Supply Contracts define "CPM Schedule" as "a graphic presentation of the planned sequence of Project activities showing the interrelationships and interdependencies of the Project elements which identify their relative degrees of criticality." The "Contract Schedule" is defined as "the schedules for drawings, Equipment and Services as set forth in Appendix III, Sections B and C." *(White Aff., Exs. D and E, Supply Contracts, Article 1.1.)* Article 2.2 also refers to Appendix III for the delivery of the above. *(Id., Article 2.2.)* Article 2.10 expressly states that

11

Mitsubishi was required to submit a "detailed electronic fabrication and Delivery schedule"

consistent with the overall Project Schedule with proposed dates for completions. In addition,

Article 2.10 states that Mitsubishi "shall be responsible for ensuring that performance of the

Work proceeds" in accordance with Mitsubishi's baseline CPM schedule as set forth in

Appendix III, Section A, and shall be required to update the CPM schedule on a monthly basis as

the work progresses including delay and acceleration analyses. *(Id., Article 2.2.)* The NEPCO or

EPC Contract with AES also provides for a CPM schedule that was required to update

throughout the Project. *(White Aff., Ex. C, Article 2.1.11.)*

NEPCO first managed the project from October 2000 until its bankruptcy in December

2001. *(White Aff., Ex. F, SOC at 13.)* NEPCO used a highly sophisticated scheduling system

from Primavera. S&W elected to take over the project on March 7, 2002, after receiving a report

from AES for the period ending January 31, 2002 stating that construction was then 64%

complete, and that engineering progress was 99.8% complete. S&W had agreed to only a 14

day extension, but it had not received consent from Mitsubishi on this limited extension. *(Id. at*

*15, 16.)*

Like its predecessor, S&W managed the Project using highly sophisticated Primavera

scheduling software and employed a dedicated Project Controls team to maintain the schedule.

S&W, however, deliberately avoided presenting the Tribunal with any form of schedule analysis.

Although the Tribunal even requested the analysis, S&W refused. *(White Aff., Ex. A, PFA at 86,*

*¶152.)* We note that S&W submitted 16 witness statements from 9 different fact witnesses, but

failed to submit any witness statement from its Project Controls Manager, Michael Middaugh.

**F.    THE ARBITRATION HEARING AND MAJORITY OPINION AND DISSENT**

On August 29, 2003, S&W commenced arbitration. *(White Aff., Ex. A, PFA at 11.)* The Arbitration hearing occurred in May 2005 and continued for approximately a two week period. *(Id. at 16, ¶14.)* Although the opinion, on its face, appears thorough, the 600 pages largely consist of duplication of the provisions in the Supply Contracts and duplication of the arguments of the parties. On its face, it appears that the majority considered the proofs and contract terms, but in reality the majority took the role of an advocate expert as opposed to an objective evaluator of the claims. The dissent characterized the majority's award as "nothing more than a result in search of a rationale." *(White Aff., Ex. B, Dissent at 2.)*

According to the majority, the commissioning occurred from November 16, 2002 and extended through July 24, 2003, with April 22, 2003 being the final date allowable for PA to take place with no penalties. *(White Aff., Ex. A, PFA at 179, ¶¶288-89; Appendix I at 35, n.1.)*[5]

The parties, both Mitsubishi and S&W, however, maintained that PA or provisional acceptance was achieved on July 24, 2003. The majority, nonetheless, accepted that because AES would not initially accept S&W's position that PA was achieved on July 24, 2003, then PA was not achieved until the owner AES agreed on August 8, 2003. *(White Aff., Ex. A, PFA at 9.)* There appears to be no legitimate basis to hold Mitsubishi accountable for a dispute between AES and S&W, especially because S&W advocated to AES that PA was achieved on July 24, 2003, and ultimately AES accepted July 24, 2003 as the date that PA was achieved. *(Id. at 576.)*

_____

[5] There appears to be a discrepancy between the narrative of the majority opinion and its chart on the Commissioning Period. The narrative in the PFA states that commissioning began on November 15, 2002; while the chart designates November 16, 2002 as the start date.

The PFA assessed 108.5 days of delay against Mitsubishi totaling $14,504,519.11. *(Id. at 9, 646, ¶760.9.)* The majority agreed that the award of LDs was contingent upon the outcome of the Texas action and retained jurisdiction for another phase of the dispute to determine how to interpret the majority award in light of the Texas action. *(Id. at 642, ¶ 752, 644.)*

## ARGUMENT

### POINT ONE

**THE PARTIAL FINAL AWARD SHOULD BE VACATED
BECAUSE THE MAJORITY MANIFESTLY DISREGARDED
THE LAW AND THE TERMS OF THE CONTRACT.**

An application to vacate or set aside the award will be governed by the general provisions of the Federal Arbitration Act ("FAA") and the accompanying federal judicially created concept of "manifest disregard standard." Arbitration is a creature entirely of contract. *See, e.g., United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 570 (1960) (Brennan, J., concurring); *Sole Resort S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 104 (2d Cir. 2006) ("[a]rbitration is entirely a creature of contract"); *Dluhos v. Strasberg*, 321 F.3d 365, 369 (3d Cir. 2003); *NBC v. Bear Stearns & Co.*, 165 F.3d 184, 186 (2d Cir. 1999) ("commercial arbitration is a creature of contract"); *Harrison v. Nissan Motor Corp.*, 111 F.3d 343, 351 (3d Cir. 1997). The authority of an arbitrator or arbitral tribunal to bind a party depends completely on the parties' consent to be bound. *See, e.g., China Minmetals Materials Import & Export Co. v. Chi Mei Corp.*, 334 F.3d 274, 281 (3d Cir. 2003) ("no arbitration may be compelled in the absence of an agreement to arbitrate") (citations omitted).

Unlike a court, which derives its authority from Constitutional and statutory authorization, an arbitrator or arbitral tribunal does not have the right to declare whether it has the power to adjudicate a dispute. *See, e.g., AT&T Techns. v. Commc'ns Workers of Am.*, 475 U.S. 643, 651 (1986) (arbitrator not given "'the power to determine his own jurisdiction'")

14

(citation omitted); *China Minmetals Materials Import & Export Co.*, 334 F.3d at 288. If the parties have conferred adjudicatory power by consenting to a particular arbitrator or tribunal, then that authority may determine the <u>scope</u> of the powers the parties conferred. *Id.*

An arbitration award can be vacated "where the arbitrators exceed their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter was not made." 9 *U.S.C.* § 10. Arbitrators' awards can also be vacated or modified, where, as here, there is a manifest disregard of the terms of the agreement, or where there is a manifest disregard of the law. *Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 26-27 (2d Cir. 1997); 9 *U.S.C.* §§ 10, 11. *See also Leed Architectural Prods., Inc. v. United Steelworkers of Am., Local 6674*, 916 F.2d 63, 65-66 (2d Cir. 1990) (manifest disregard of the terms of the agreement); *Fahnestock & Co. v. Waltman*, 935 F.2d 512, 515 (2d Cir. 1991) (manifest disregard of the law); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir. 1986) (recognizing manifest disregard of the law.)

An award can be vacated based upon the judicially created doctrine of "manifest disregard of the law." *See Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 385, 388-89 (2d Cir. 2003) (providing that to vacate an arbitral award for a manifest disregard of the law, the court must find that the arbitrators understood but chose to disregard a clearly defined law or legal principle applicable to the case before them);[6] *Goldman v. Architectural Iron Co.*, 306 F.3d 1214, 1216 (2d Cir. 2002). Manifest disregard of the law exists when "the error [was] obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator." *Merrill Lynch, Pierce, Fenner & Smith, Inc.*

---

[6] In *Duferco*, the Second Circuit also noted that "[t]he error must be so palpably evident as to be readily perceived as such by the average person qualified to serve as an arbitrator." *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d at 385.

*v. Bobker*, 808 F.2d at 933; *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S,* 333 F.3d at

385.

In addition, the term "disregard" implies that the arbitrator appreciated the existence of

the legal principle but ignored it. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker,* 808

F.2d at 933 (manifest disregard of the law.); *Fahnestock & Co. v. Waltman,* 935 F.2d at 515

(manifest disregard of the law). *See also Duferco Int'l Steel Trading v. T. Klaveness Shipping*

*A/S*, 333 F.3d at 385, 388-89 (manifest disregard of the law); *Goldman v. Architectural Iron Co.,*

306 F.3d at 1216.

Courts have applied the same standard to the interpretation of contracts. *Yusuf Ahmed*

*Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.,* 126 F.3d at 32. *See also Leed Architectural*

*Prods., Inc. v. United Steelworkers of Am., Local 6674,* 916 F.2d at 65-66 (manifest disregard of

the terms of the agreement). If the arbitrators made a purposeful decision to ignore what the

parties intended, then the FAA empowers the district court to vacate the award. *DiRussa v. Dean*

*Witter Reynolds, Inc.,* 121 F.3d 818, 821 (2d Cir. 1997). Where, as here, the majority merely

"makes the right noises"—noises of contract interpretation—"while ignoring the clear meaning

of the contract terms," the FAA authorized the district court to vacate the award. *In re Marine*

*Pollution Serv., Inc.,* 857 F.2d 91, 94 (2d Cir. 1988) (quotation and citation omitted.)

**A.    The Award Should Be Vacated Because the Majority Manifestly Disregarded the Law and Contract Provisions Regarding Scheduling and Delay Damages.**

The majority failed to acknowledge and consider the baseline schedule agreed to by all

the parties pre-construction. The parties agreed at the time they entered into the Supply

Contracts that the baseline CPM schedule would be the basis from which performance and any

purported delay would be measured. Because the majority incorrectly exercised its powers and

16

manifestly disregarded the law and contract provisions regarding measuring and imposing delay

damages, the PFA should be vacated and the matter remanded.

Article 2.10 contains specific provisions regarding the detailed electronic delivery

schedule for the work to be performed by Mitsubishi. *(White Aff., Exs. D and E, Supply*

*Contracts, Article 2.10.)* Mitsubishi's baseline CPM schedule was to be provided in a manner

consistent with the Project CPM schedule. All the parties on the Project were contractually

obligated to perform according to the CPM scheduling.[7] The majority, however, ignored the

CPM baseline schedule and made no comparison between the baseline schedule and the

performance schedule. Without measuring against the baseline, it is impossible to accurately

determine when the delay commenced, for how long and the cause of the alleged delay.

Absent an analysis of the delay based upon the baseline schedule, the majority ignored

not only the precise contractual provisions in the Supply Contracts but also how the Project was

structured and completed. The majority was aware of the provisions and even referenced them,

but elected to ignore them. In fact, the majority acknowledged the significance of the baseline

schedule and its counterpart, the as-built schedule, commenting that each of them were a part of

the delay analyses used by experts in cases such as this. *(White Aff., Ex. A, PFA at 87, ¶153.)*

Moreover, the majority made critical assumptions that the self-serving evidence it relied

upon was based upon facts that were never established in the record. Specifically, the majority

stated:

> Article 2.0 is entitled "scope, Schedule and Supplier Obligations". The primary
> time-related Article here is 2.10, which requires that Mitsubishi perform the Work
> in accordance with the Purchaser's (Stone and Webster) baseline CPM schedule
> which is updated on a monthly basis. We have not been advised that the Stone

---

[7] The contract with the AES contains the same provisions regarding CPM scheduling and the
Project Schedule. *(White Aff., Ex. C, Article 2.1.11.)*

17

and Webster monthly analyses we read in Respondent's file 4, were in fact intended to be those updated schedules, but we **assume** they are.

*(Id. at 332, ¶432)(emphasis added).*

Here, the majority makes a critical assumption that the monthly reports it reviewed contained the updated information of accelerations and delays to the CPM baseline schedule. *(Id.)* There is no basis for this assumption, and more importantly, the majority could have requested that information from S&W under the ICDR rules, but instead elected to assume facts of this magnitude in order to create a critical assumption to support its ruling. *(ICDR Procedures, International Arbitration Rules, R-3, Article 19.3.)* It is therefore not surprising that the dissenting arbitrator characterized the majority's decision as result driven. *(White Aff., Ex. B, Dissent at 2.)*

Furthermore, the majority acknowledged that network analysis was "good practice," and that experts properly analyze delay by comparing the schedule at the beginning of the project (the as-planned baseline schedule) to the schedule of performance (the as-built schedule). *(White Aff., Ex. A, PFA at 88, ¶ 156, 117, ¶ 204.)* Here, the majority did neither, and instead used what it described as the legal equivalent of a substandard "slide ruler" approach. *(Id. at 87, ¶154.)* In so doing, the majority completely ignored what the parties contracted for and what they expected that their performance would be measured by.

Mitsubishi contracted to supply equipment in accordance with a CPM schedule as provided in the Supply Contracts. Likewise, it further agreed that if it delivered its equipment late or the equipment was defective and prevented the achievement of PA (provisional acceptance) before GPAD (guaranteed date of provisional acceptance), then Mitsubishi would be responsible for LDs paid by S&W to AES for such delays that were attributable to Mitsubishi. The time frame for Mitsubishi's performance was to be measured as contracted—pursuant to a

18

CPM schedule. Mitsubishi never agreed for its performance to be measured by a "slide-ruler" *ad hoc* approach imposed by third parties post-performance. If the majority could not render a decision according to the contract terms, then the ICDR rules provide that the arbitrators can request the necessary information from the parties. *(ICDR Procedures, International Arbitration Rules, R-3, Article 19.3.)*

The majority was well aware that the information it needed to comply with good practice and the Supply Contracts, S&W had retained an expert, and although invited by the majority to produce the expert analysis, it refused. The majority recognized this deficiency and stated that it would take into account the prejudice to Mitsubishi because of its inability to cross-examine such an expert, but it failed to consider this deficiency in its assessments of the delay claims alleged by S&W. *(White Aff., Ex. A, PFA at 88, ¶156.)* The majority expressly stated that it preferred the delay allocation methods referenced by Mitsubishi which require CPM analysis, but it failed to direct the parties to perform such an analysis. *(Id., at 88-89.)*

Rather, the majority engaged in its own analysis by reviewing self-serving monthly reports prepared by S&W that Mitsubishi never even saw and was never given the opportunity to challenge. Furthermore, those reports covered only the end portion of the project after S&W took over in March 2002. Not a single report referenced by the majority covered the timeframe where NEPCO, S&W's predecessor, was acting as the EPC contractor. *(See generally White Aff., Ex. A, PFA at 117 (listing reports).)* The performance and associated delay caused by NEPCO and its bankruptcy was ignored, and no scheduling information or monthly reports addressed the purported 76 day delay that S&W attributed to AES's overstatement of the engineering progress during negotiations. The 76 day delay was raised by Mitsubishi *(see White Aff., Ex. F, SOC at 17-18 & n.28)*, but they were completely ignored by the majority. Similarly,

19

no consideration was given to S&W's failure to produce these schedules in discovery or its failure to produce a CPM analysis.

Furthermore, because of its substandard approach, the majority failed to properly assess concurrent delays and afforded no adjustment to Mitsubishi for simultaneous delay that was admittedly critical and caused by S&W. For example, there was a fire in one building that admittedly impacted the critical path. The fire is referred to as the MCC Building remediation fire and even the S&W reports note that the lube oil was not critical at this time. *(White Aff, Ex. A, PFA at 124, ¶213, 214.)* The majority referenced evidence that confirmed that the fire caused significant delay and any available float was being used because of the fire, yet it afforded Mitsubishi no adjustment and assessed a 17 day delay for the lube oil flushing. *(Id. at 9.)*

Here, Mitsubishi was severely prejudiced by the majority's manifest disregard of the terms of the agreement and the law relating to S&W obligations to prove that the delays were related to Mitsubishi's conduct. The majority's amateur substandard schedule analysis was not what was provided for in the Supply Contracts. The majority engaged in this unauthorized analysis without notice to Mitsubishi or its consent, thereby denying Mitsubishi the opportunity to defend the claims.

The Supply Contracts, Article 20.3(viii), specifically state that:

> The arbitrators are not empowered to award damages in excess of compensatory damages. In arriving at their decision, the arbitrators shall be guided and bound by the terms and conditions of the Contract.

*(White Aff., Exs. D and E, Supply Contracts, Article 20.3(viii)).*

Because the majority applied a schedule analysis that it knew the parties did not agree to or contemplate, the majority failed to abide by the terms of the Supply Contracts which measured performance against the baseline CPM schedule agreed to by the parties. By deciding matters

contrary to the terms of the Supply Contracts, the majority made an award by extending its authority beyond the boundaries set by the parties. In so doing, the majority exceeded its authority. *See* 9 *U.S.C.* §10.

Mitsubishi agreed to arbitrate this matter within the confines and parameters the parties agreed to in the Supply Contracts. *See* 9 *U.S.C.* §10. The Supply Contracts required proper CPM analysis, as the parties were contractually obligated to perform pursuant to the baseline CPM schedule, and were also required to update those schedules noting delays and accelerations. S&W had an entire group dedicated to scheduling using Primavera scheduling, which contains an algorithm that calculates, correlates and designates the critical activities along the schedule and any delay or acceleration period associated with that path of performance. Moreover, because Mitsubishi can only be liable to S&W for LDs S&W paid to AES that were caused by Mitsubishi's performance, the "baseline schedule" as compared with the "as built" is the proper method to analyze delay. Indeed, this is the analysis that will ultimately be necessary for the remainder of the matter and in order to determine what is actually due and owing to S&W, if anything. Unless this analysis is used in the first instance, it will be difficult, if not impossible, for the Tribunal to properly assess delay with any degree of certainty as to who in fact caused the delay and to what extent. Under these circumstances, the majority's unilateral and unauthorized analysis was improper and warrants a remand and a vacation of the award.

**B.    The Award Should Be Vacated Because The Majority Manifestly Disregarded The Contractual Provision That LDs Could Not Be Awarded For Services.**

Pursuant to Article 9.9.1 of the Turbine Contract, Mitsubishi agreed to be obligated for LDs only if: (1) PA was not by GPAD; and (2) the delay was "attributable to short-falls in the performance of Equipment…or defects in such equipment which prevent[ed] such equipment from being started-up or tested within the required time." *(White Aff., Ex. D, Turbine Contract,*

21

*Article 9.9.1.)* Alleged deficiencies related to performance of non-equipment related items, such as Technical Field Advisory ("TFA") services, are not subject to LDs. The sole contractual remedy for such delay is the imposition upon Mitsubishi to use "best efforts" to overcome the delay. *(White Aff., Exs. D and E, Supply Contracts, Article 9.11.5; see also White Aff., Ex. B, Dissent at 5.)*

The majority assessed 108.5 days of delay against Mitsubishi. This assessment included alleged delays caused by services, even services rendered in connection with equipment from third parties, which is clearly outside the scope of the Supply Contracts. *(White Aff., Ex. A, PFA at 54, ¶96, 97, 34, ¶75.)* By way of example, the TFA services rendered during the commissioning period were pure services and did not relate to any equipment. The TFA services during commissioning related to testing and start-up. As a result, there should have been no assessment of LDs for these services.

Moreover, as specifically reflected in Appendix 1 of the PFA which relates to the LDs for the commissioning period, there are numerous days referenced which are dedicated to service, not equipment. Confirmation of operations, preparation of tests, functional testing, alleged negligent inspections, cleaning work, spin blowing and cleaning work are all service related items that do not permit LDs. *(Id., Appendix 1 at 25-35.)* The delay assessed against Mitsubishi for the commissioning period totals 43.5 days, amounting to approximately $5.4 million.

Similarly, with regard to the assessment of 34 days of delay for the Turbine/TCA issue, the majority again awarded LDs for a matter that involved TFA services. *(Id. at 9.)* The Turbine/TCA issue related to clogging in the steel pipe of foreign particles. Mitsubishi did not supply the pipe and it was clearly and indisputably outside the scope of the Supply Contracts. Mitsubishi did not have responsibility for anything outside the turbine and Mitsubishi was never

the EPC contractor on this Project. Nonetheless, the majority held Mitsubishi accountable for the defects of a third party and failure to inspect the work of another. *(Id. at 481-484.)*

Mitsubishi was not the EPC contractor. S&W was paid $100 million to act as the general contractor on the Wolf Hollow Project. NEPCO was paid millions to perform prior to S&W's takeover. Mitsubishi was not compensated to assume the responsibility for work performed by third parties outside the scope of the Supply Contracts. By virtue of its rulings, the majority essentially placed Mitsubishi in the shoes of the EPC contractor and relieved S&W from any responsibility.

The parties agreed that services were not subject to LDs. The majority ignored this restriction and not only imposed LDs for services performed by Mitsubishi, but also unilaterally expanded the scope of Mitsubishi's obligations under the Supply Contracts. In so doing, the majority deliberately ignored the precise terms of the Supply Contracts and paid only "lip service" to the limitations and parameters set forth therein. Because the majority deliberately disregarded these limitations, the PFA should be vacated and the matter remanded.

### C. The Award Should Be Vacated Because The Majority Manifestly Disregarded That LDs Could Not Be Awarded For Equipment Defects Post-Provisional Acceptance Because Such Defects Became Warranty Issues.

The Supply Contracts provide for LDs only before PA is achieved. Once PA is achieved, any equipment defect issues become warranty items because the project is operational. S&W and Mitsubishi agreed that PA was achieved on July 24, 2003. In fact, S&W disputed this matter with the owner AES and prevailed upon them to accept PA as of July 24, 2003, and AES agreed. *(Id. at 576, ¶¶688-89.)*

Thereafter, an issue arose relating to the TEG fans which the majority imposed an assessment of 14 days of delay upon Mitsubishi. The TEG fans or ammonia fans involved

23

temporary non-conformities which had no impact on the schedule and occurred post-PA. In assessing the 14 day delay, the majority refers only to Mitsubishi's delay in answering questions posed by AES. *(White Aff., Ex. A, PFA at 577, ¶ 692, 578, ¶ 695.)* Indisputably, answering questions relates clearly to service and in no way impacted the achievement of PA. For these reasons, the majority manifestly disregarded the precise terms of the Supply Contracts in assessing 14 days of delay for the TEG fan issue which occurred post-PA, and the award should be vacated.

## CONCLUSION

For all of the foregoing reasons, Petitioners respectfully request that this Court grant the

Petition to Vacate the Arbitration Award pursuant 9 U.S.C. §10, together with such other and

further relief as the Court deems just and proper.

Respectfully submitted,

SILLS CUMMIS & GROSS, P.C.
One Rockefeller Plaza
New York, New York 10020
(212) 643-7000

By: _____
PHILIP R. WHITE

Dated: January 18, 2008